# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## CARROLL COUNTY

IN THE MATTER OF:

ESTATE OF: HELEN L. MCDANIEL

CHRISTINE MCLEAN et al.,

Plaintiffs-Appellants/
Cross-Appellees,

v.

ESTATE OF HELEN L. MCDANIEL et al.,

Defendants-Appellees/
Cross-Appellants.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 22 CA 0956**

---

Probate Appeal from the
Court of Common Pleas, Probate Division
of Carroll County, Ohio
Case No. 20184004

**BEFORE:**
Carol Ann Robb, Cheryl L. Waite, Mark A. Hanni, Judges.

---

**JUDGMENT:**
Affirmed.

[Cite as *In re Estate of McDaniel*, 2023-Ohio-1065.]

*Atty. Thomas C. Loepp*, Law Office Co., LPA, 3580 Darrow Road, Stow, Ohio 44224 for Plaintiffs-Appellants/Cross-Appellees and

*Atty. Mel L. Lute, Jr, Atty. Andrea K. Ziarko,* Baker Dublikar, 400 S. Main Street, N. Canton, Ohio 44720 for Defendants-Appellees/Cross Appellants.

Dated:  March 30, 2023

_____

**Robb, J.**

{¶1}    Appellants, Christine and David McLean, appeal the trial court's December 30, 2021 judgment following a bench trial and contend the trial court erred by failing to find they are the rightful owners of the decedent's farm.  Appellees and Cross-Appellants, the estate of Helen McDaniel, and her beneficiaries, Bradley and Todd Tacy, separately appeal and claim the court's judgment ordering them to pay Appellants $112,000 as damages for unjust enrichment is against the manifest weight of the evidence.

{¶2}    Appellants asserted numerous causes of action arising from their alleged oral agreement with Christine's mother, Helen McDaniel.  Appellants allege Helen promised to give them her real estate, the family farm consisting of approximately 84 acres, upon her death, in exchange for Appellants agreeing to move onto the farm to assist her with her personal needs and to maintain the farm during Helen's life.

{¶3}    The trial court held Appellees and Cross-Appellants, Bradley and Todd Tacy, were the rightful owners of Helen's farm, as the named beneficiaries in her May 19, 2017 transfer on death affidavit.  It also found Appellants' unjust enrichment claim had merit and entered judgment in their favor in the amount of $112,000 against Appellees, Helen's nephews and beneficiaries.  The court found Appellants' remaining claims lacked merit.

{¶4}    For the following reasons, Appellants' and Appellees' arguments on appeal lack merit, and we affirm.

## Statement of the Case

{¶5}    In June of 2017, Appellants filed suit in the Carroll County Court of Common Pleas against Christine's mother, Helen McDaniel, among others.  Helen died testate in February of 2018, and the case was transferred to the probate division.  Appellants filed their amended complaint in June of 2018 and named the Estate of Helen McDaniel and

her co-executors, Bradley and Todd Tacy in their representative capacity as well as in their individual capacities, and the county treasurer. Appellants asserted 17 claims for relief, labeled alphabetically A through Q. Their complaint included breach of contract, unjust enrichment, and declaratory judgment claims, and others. (June 8, 2018 Amended Complaint.)

{¶6} The estate and Bradley and Todd Tacy counterclaimed for eviction, trespass, unjust enrichment, breach of the covenant of quiet enjoyment, declaratory judgment seeking a determination that they were the rightful owners of the decedent's real property, and sought preliminary and permanent injunctions enjoining Appellants from occupying the premises. (June 9, 2018 Answer & Counterclaim.)

{¶7} Following the exchange of discovery, summary judgment motions, and COVID-19 delays, the case was heard at a September of 2021 bench trial.

{¶8} Christine testified at length. She explained she and her husband David lived across the street from her mother Helen's farm. They lived on David's parents' property in an old farm house. In April of 2012, she suffered a severe asthma reaction to mold in the old house. Doctors advised her not to return to their home. David's family owned the real estate on which they lived, but he only had part ownership of it, and as such, was unable to build a home there.

{¶9} At about this same time, David was retiring from his full-time job, and he and Christine discussed relocating to be closer to his part-time job in Dover, which was 25 to 30 minutes away.

{¶10} Christine had been the primary caretaker of her mother, Helen, for years. Helen could no longer drive, but she was still ambulatory. She suffered from neuropathy, which caused her to have difficulty traversing steps. Christine went to her mother's home on most days to check on her and to assist her with her errands, such as buying groceries and attending medical appointments. Helen also had custody of her granddaughter Felicity, and Christine provided many parenting duties for Felicity as well.

{¶11} Based on the sudden loss of her home, Christine spoke with her mother about her options. She explained at trial:

> I told her I needed a newer home and one that didn't have any mold
> * * *. Because she's, * * * said something to me about moving into the old

McDaniel farmhouse [on Helen's property] * * *. We were going to need something newer. And so, she said well, I have always promised you the farm anyway, so go ahead and put your home on the farm. There's no * * * problem with that because you are getting the farm.

Q. What were your obligations to her though?

A. Well she * * * she said that you continue to take care of me, and I said well yeah, I'll continue to take care of you. And * * * my obligations also were to get a home that would be suitable for her that we could take care of her in it * * *. I got a home that was opened all in the middle so you could get a wheelchair around [in] it. * * * And we put extra decks on the house that we did not need. We still do not need to this day because none of us are handicapped.

(September 29, 2021 Tr. p. 27-28.)

{¶12} The next day, Christine, who was temporarily living in her RV to avoid the mold, drove it across the street and parked it on her mother's property so she could hook it into the running water in the barn. She and David then began preparing an area on her mother's land for them to place their double-wide manufactured home.

{¶13} She explained how they continued to do "everything" for Helen, including repairs to her old farmhouse, drove her to appointments, mowed her grass, plowed the snow, and helped her with Felicity, among other things. Christine recalled her relationship with her mother was good until Christine's adult son Nate began telling Helen lies about her in an effort to "cut her off." (Tr. 36-37.) Nate had a history of substance abuse, and Christine obtained temporary custody of his three children for some time. She sought custody based on Helen's urging and because of the children, Christine and David had a two-bedroom addition constructed on their manufactured home. The addition was permanently affixed and was not designed to be mobile or modular. They had a roof added which connected it to the modular home and that also extended over their patio and the ramp they installed for Helen.

{¶14} Appellants planned for Helen to eventually live there with them, but at this time, Helen lived on her own in her mobile home on the property. In July of 2016, the

Case No. 22 CA 0956

custody of Nate's children was returned to their mother, and Helen blamed Christine for not securing permanent custody of them. (September 29, 2021 Tr. 39-45.)

{¶15} Meanwhile, Christine's other niece moved in with Nate, and according to Christine, they were both conspiring against her. In September of 2016, Helen stopped speaking with Christine altogether. Christine secured a protective order against Nate. (September 29, 2021 Tr. 47-48.)

{¶16} At one point, Helen informed Christine she and David had 30 days to vacate the property. There was also an incident during which Christine said Bradley smashed one of her yard decorations. She felt threatened, so she got a protective order against Bradley as well. (September 29, 2021 Tr. 58.)

{¶17} It is undisputed that Christine and her mother did not have a writing memorializing their agreement. However, in 2013, consistent with Christine's agreement with Helen, Helen went to an attorney and had a transfer on death affidavit prepared. It gave Christine all property and mineral rights to the farm, all four tracts, with a life estate to Nate. Christine, however, explained she was upset because she did not agree to give Nate this life estate. Thereafter, Helen had several additional transfer on death affidavits drafted and filed, which Christine discovered after she and her mother had a falling out. Christine said it became clear to her that Bradley and Todd Tacy were trying to "get rid of her." Christine believed Bradley was stalking her, chasing her, and damaging Appellants' property. (September 29, 2021 Tr. 62-65.)

{¶18} In addition to aiding Helen with her daily life, Appellants also took care of Helen's farm and cattle. They also had their own cattle, which they kept across the street on the McLean property. Appellants used some of Helen's property to grow hay for their animals. They also grew certain crops there. Christine explained how she and David paid the taxes and insurance on Helen's farm, for all four lots or tracts, by paying Helen the cash in exchange for them farming there. Helen would pay these expenses upfront, and they would reimburse her. She preferred being paid in cash, and it avoided trips to the bank. (September 29, 2021 Tr. 110.)

{¶19} On cross-examination, Christine agreed there was no written agreement by which Helen promised her the farm in exchange for taking care of Helen. She and Helen

were the only people present when they entered into their oral agreement. (September 29, 2021 Tr. 122-123.)

{¶20} David testified he does not talk much, and he was not present when Helen and Christine entered their oral agreement. He never spoke with Helen about the terms of the agreement. He explained the cows they raised were mostly for the 4-H youth organization, and they were not raising animals for profit, but they did get some food from their efforts. It was mostly a hobby. He recalls paying Helen cash for the property taxes and insurance in exchange for using her property. (September 29, 2021 Tr. 149-153.)

{¶21} A family friend, Robert Champer, testified he repeatedly told Helen he would like to buy the farm from her, but she always responded that she had "promised it to Chrissy." He also recalled Helen saying she was going to "will it" to Christine or Chrissy. (September 29, 2021 Tr. 156-158.)

{¶22} Donna Hanna, the area 4-H advisor, knew the family well, and she recalled Christine became a 4-H helper when her niece Felicity was younger. On several occasions, Donna heard Helen indicate she was leaving the farm to Christine. (September 29, 2021 Tr. 177, 183.)

{¶23} Robert Garrett testified he built the addition on Appellants' modular home. He explained the addition added two bedrooms and an extended roof. They paid him $15,000 for the addition. He said the addition was not designed or intended to be moved, so if the home were relocated, the addition and most of the materials would be a total loss. The porch would be a loss too because it "was put in the ground * * * to be permanent." He said too much was anchored to the ground to move the home. Garrett recommended against moving the home, but he estimated it would cost about $45,600 for tearing everything down and moving the manufactured home to another location. (September 29, 2021 Tr. 175-176.)

{¶24} Bradley Tacy testified he played on his Aunt Helen's farm as a child with his cousins, but he had not seen her in some time. On one occasion, as part of his job, he delivered fuel to Helen's farmhouse. Helen and Christine were there. They were welcoming, and the three spoke for some time. Helen did not recognize him at first. Thereafter, Bradley began visiting her weekly, and he would occasionally assist her with minor maintenance tasks. Bradley recalled Helen asked him and his brother to help Nate

move out of the farmhouse.  Bradley denied knowing Helen was giving him and his brother the farm until Christine filed the lawsuit against them in June of 2017.  He denied telling Christine the farm was "mine.  All this is mine."  He also denied damaging her property and stalking her.  (September 30, 2021 Tr. 20-30.)

{¶25}  Todd Tacy testified as well.  He is Bradley's younger brother, and Helen is their mother's sister.  Todd likewise said the first time he realized his Aunt Helen was leaving him and his brother the farm and the mineral rights was when he received notice of the lawsuit Christine filed.  (September 30, 2021 Tr. 35-38.)

{¶26}  Helen's personal attorney, Vincent Slabaugh testified for the defense. Helen first hired him in 2013 for estate planning purposes.  Slabaugh created Defendant's exhibit D, the April of 2013 transfer on death affidavit for Helen.  Through this first transfer on death affidavit, Helen was giving Christine the farm and all mineral rights with a life estate to Nate in the farmhouse to allow him to live on the property.  Slabaugh explained Nate suffered from addiction, and Helen was trying to protect him.

{¶27}  Thereafter, on December 1, 2016, Helen had Slabaugh prepare another transfer on death affidavit, Defendant's exhibit C.  Pursuant to exhibit C, Helen was going to give her property's mineral rights to Bradley Tacy and still give the real estate to Christine when Helen died.  Helen had told Slabaugh she and Christine had a "falling out."

{¶28}  Then, on December 22, 2016, Helen executed Defendant's exhibit B, a third transfer on death affidavit, by which she gave Bradley half of the real property, or two of the four tracts.

{¶29}  The final transfer on death affidavit Helen had Slabaugh prepare was executed in May of 2017.  It was marked as Defendant's exhibit A.  It gave everything, all mineral rights and all the real property, all four tracts, to Bradley and Todd Tacy, with each receiving a one-half interest.

{¶30}  In all, Helen signed and had filed four different transfer on death affidavits prepared by Slabaugh.  She died in February of 2018, and the final transfer on death affidavit was controlling according to Slabaugh, as it revoked and replaced all prior ones. Slabaugh was confident Helen had the mental capacity to execute legal documents at the time it was signed.

{¶31}  Slabaugh also said he prepared the notice of eviction directed to Appellants, which identified them as Helen's tenants.  Slabaugh recalled several reasons Helen was mad or upset with Christine on different occasions.  At one point, Helen had difficulty securing insurance for the farm because Christine was using the property as a petting zoo.  Separately, Helen was furious at Christine when she wrote to Helen's doctor inquiring about her mental health and capacity.  Helen was also upset with Christine at a different time because Felicity moved out of Helen's mobile home and moved in with Christine.

{¶32}  According to Slabaugh, Helen also denied knowing Appellants were placing their manufactured home on her acreage.

{¶33}  Slabaugh said that when Helen received Appellants' lawsuit, she was very agitated.  Slabaugh recalled going over the complaint with her, and Helen denied entering an agreement by which she promised to give Christine the farm.  He said she never wavered from her position.  Slabaugh also recalled Helen telling him she and her late husband had planned to give Christine the farm, but Helen denied entering any agreement with Christine obligating Helen to transfer her the farm upon her death.

{¶34}  Slabaugh also testified that to his knowledge, Bradley and Todd did not know Helen was creating these legal documents and leaving them the farm.  (September 30, 2021 Tr. 41-68.)

{¶35}  The trial court rendered its decision via its December 30, 2021 Judgment Entry and found both parties prevailed on certain aspects of their competing claims.  The court's 45-page decision held in part that Bradley and Todd Tacy were the rightful owners of the decedent's real estate via Helen's May 19, 2017 transfer on death affidavit.  (December 30, 2021 judgment, 40.)

{¶36}  The court also found Appellants' unjust enrichment claim had merit and Appellees had been unjustly enriched via Appellants' construction and permanent affixing of their manufactured home to the real estate.  The court ordered Bradley and Todd Tacy, jointly and severally, to pay Appellants $112,000 within 90 days, and Appellants were simultaneously ordered to execute and deliver the certificate of title to the manufactured home located on the property to Bradley and Todd Tacy.  (December 30, 2021 judgment,

36-37, 44-45.) It found the remaining, competing claims lacked merit. The court's lengthy decision is best summarized in one paragraph:

> [T]he plaintiffs have failed to prove that any of the defendants acted tortiously with respect to the plaintiffs. Based upon the evidence, the Court has not found that Helen McDaniel or Bradley and Todd Tacy acted fraudulently, maliciously, or recklessly in connection with the chain of events that led up to the plaintiffs locating their double-wide manufactured home on the property. Neither has the Court found sufficient proof of a promise, representation, or misrepresentation by the defendants to plaintiffs. Although not directly related to the issue of fault, the Court also found that plaintiffs have not sufficiently proven the existence of a contract. Exactly what was said between Christine and Helen remains disputed. Was there really an agreement or was it just a less than well thought out way of a mother helping her daughter in the middle of a health emergency? The answer is uncertain.

(December 30, 2021 judgment, p. 35.)

**{¶37}** Appellants appealed and raise two assignments of error, and Appellees cross-appealed asserting one assignment of error.

## Arguments on Appeal

Appellants' First Assignment of Error: Manifest Weight of the Evidence

**{¶38}** Appellant's first assigned error asserts:

"The trial court's decision is against the manifest weight of the evidence."

**{¶39}** Appellants' first assignment of error consists of ten sub-arguments. Each assignment asserts a certain aspect of the court's decision is against the manifest weight of the evidence.

**{¶40}** To warrant reversal from a bench trial under a manifest weight of the evidence claim, we review the record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in evidence, the trial court clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).

Case No. 22 CA 0956

{¶41} Appellate courts "should not reverse a decision simply because it holds a different opinion concerning the credibility of the witnesses and evidence submitted before the trial court. * * * The determination of credibility of testimony and evidence must not be encroached upon by a reviewing tribunal * * *." *Seasons Coal Co. v. City of Cleveland*, 10 Ohio St.3d 77, 81, 461 N.E.2d 1273 (1984); *accord Andes v. Winland*, 2017-Ohio-766, 85 N.E.3d 1098, ¶ 31 (7th Dist.).

{¶42} The credibility of the witnesses is primarily for the finder of fact because the trial judge is best able to view the witnesses and observe their demeanor, including voice inflections and body language. *Seasons Coal Co.*, *supra*, at 80.

### Appellants' Sub-arguments A, B & C

{¶43} We address Appellants' first three sub-arguments collectively, which arise from their breach of contract claim. Their sub-argument A contends the court erred by not finding an enforceable oral contract between Helen and Christine. Their sub-arguments B and C stem from and are contingent on the court's alleged erroneous breach of contract determination. Appellants claim as a result of the contract, they were entitled to a finding that Helen breached the duty to act in good faith and fair dealing. Appellants also claim the court erred by not ordering specific performance of the oral agreement and awarding them the farm. For the following reasons, these three arguments lack merit.

> '[A contract is a] promise or a set of promises for the breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty.' In order to declare the existence of a contract, both parties to the contract must consent to its terms; there must be a meeting of the minds of both parties; and the contract must be definite and certain.

(Citations omitted.) *Episcopal Retirement Homes, Inc. v. Ohio Dept. of Indus. Relations*, 61 Ohio St.3d 366, 369, 575 N.E.2d 134 (1991), quoting Restatement of the Law 2d, Contracts 5, Section 1 (1981).

{¶44} Pursuant to the statute of frauds, R.C. 1335.05, to bring an action for the enforcement of an agreement involving the transfer of an interest in land, the agreement must be in writing. *Gleason v. Gleason*, 64 Ohio App.3d 667, 673, 582 N.E.2d 657 (1991).

{¶45} Here, it is undisputed that there was no writing. Thus, in order for the court to find an enforceable oral contract between Christine and Helen for the transfer of her

mother's farm, there must be an applicable exception to the statute of frauds. Appellants urged the court to find the equitable doctrine of partial performance applied, which is an exception to the statute of frauds. *Saydell v. Geppetto's Pizza & Ribs Franchise Sys., Inc.*, 100 Ohio App.3d 111, 121, 652 N.E.2d 218 (1994).

**{¶46}** For the doctrine of partial performance to apply, a plaintiff must establish both the existence of the oral contract and the applicability of the doctrine of partial performance by clear and convincing evidence. *Tier v. Singrey*, 154 Ohio St. 521, 529, 97 N.E.2d 20 (1951); *Nofzinger v. Blood*, 6th Dist. Huron No. H-02-014, 2003-Ohio-1406, ¶ 53.

> Clear and convincing evidence is that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases. It does not mean clear and *unequivocal*.

(Emphasis sic.) *Cross v. Ledford*, 161 Ohio St. 469, 477, 120 N.E.2d 118 (1954).

> Partial performance 'must consist of unequivocal acts by the party relying upon the agreement, which are exclusively referable to the agreement and which have changed his position to his detriment,' making it impossible or impractical to place the parties in status quo; '[i]f the performance can reasonably be accounted for in any other manner or if plaintiff has not altered his position in reliance on the agreement, the case remains within the operation of the statute.'

*Thies v. Wheelock*, 2017-Ohio-8605, 100 N.E.3d 903, ¶ 31 (2d Dist.), quoting *Delfino v. Paul Davies Chevrolet, Inc.*, 2 Ohio St.2d 282, 287, 209 N.E.2d 194 (1965).

**{¶47}** The trial court held Appellants failed to establish the existence of an oral agreement. It emphasized Christine's testimony conflicted with Helen's statements as repeated by her attorney. He testified Helen never told him about the alleged oral agreement, and she vehemently denied the allegation when Christine filed the lawsuit against Helen.

**{¶48}** Moreover, when addressing the parties' behavior to ascertain whether Helen and Christine showed mutual assent via their conduct, the trial court did not find their conduct established the alleged oral agreement. Instead, the court noted after the alleged agreement, nothing really changed for Helen. Although Appellants placed a home on her property, the court explained how the testimony showed Appellants provided her needs with the same companionship and aid or assistance as before the alleged oral agreement was allegedly entered.

**{¶49}** The trial court concluded Appellants' placement of their manufactured home on Helen's property was the only change in conduct, and the court did not find this was clear and convincing evidence that an oral agreement existed by which Helen agreed to give Christine and David the property in exchange for their continued efforts to assist her. (December 30, 2021 judgment.)

**{¶50}** We agree with the court's conclusion and find Appellants failed to establish the existence of an oral agreement via clear and convincing evidence. As detailed previously, this case involves conflicting testimony about the existence of an oral contract. Christine explained the details of the alleged oral agreement, whereas Helen's lawyer recounted that Helen denied the allegations. The trial court, as the fact-finder, was free to believe some, all, or none of the testimony of any witness. *Domigan v. Gillette*, 17 Ohio App.3d 228, 229, 479 N.E.2d 291 (1984).

**{¶51}** Further, although Helen's initial transfer on death affidavit leaving the property to Christine tends to bolster Christine's claim in part, Christine's recollection of the agreement and this affidavit are inconsistent. As stated, the only transfer on death affidavit by which Helen gave Christine all rights to the farm, also gave a life estate in the farmhouse to Nate. Christine explained this was not part of their agreement. This difference tends to show she and Helen did *not* agree on the essential terms of the agreement. And without a showing of mutual assent about the scope or terms of the agreement, there was no "meeting of the minds" necessary for an enforceable contract.

**{¶52}** Because there was no clear and convincing evidence showing the parties mutually agreed about the scope of the agreement, there was no valid, enforceable contract. *Nofzinger v. Blood*, 6th Dist. Huron No. H-02-014, 2003-Ohio-1406, ¶ 54. Accordingly, like the trial court held, we cannot find clear and convincing evidence

producing a firm belief as to the existence of an oral contract between Helen and Christine by which Helen promised to give Appellants the farm in exchange for Appellants continued care of Helen and the property. Thus, our analysis could end here, and we need not address the exception to the statute of frauds.

{¶53} Notwithstanding, and for the sake of argument only, regarding the existence of the partial performance exception, the trial court found Appellants did not meet their burden of proof for this exception to apply to the statute of frauds. Regarding the partial performance exception, the trial court held:

> The other act or category of conduct of the plaintiffs was their locating the double-wide manufactured home onto Helen's property. Can that action be reasonably accounted for in some manner other than as having been done in pursuance of a contract? The simple answer is, yes. Arguably the persons who benefited most from this act were the plaintiffs. It was Christine's health and her severe allergic reaction to mold that prevented her from living in the old farmhouse on the McLean farm. As she testified, 'I needed to leave.' The solution to the plaintiffs' problem was supplied by Helen. Not only could the plaintiffs locate a double-wide manufactured home onto her property, they could do so rent free. While the plaintiffs had to bear the costs necessary to prepare the site for the home (excavation, well, etc.) and pay their own utilities, they paid no periodic rent to Helen. This solution also made it possible for plaintiffs to continue to do all the things they had been doing previously, both in conducting their farming operation and in continuing to do things for Christine's mother as they had for several years. Plaintiffs on the other hand claimed that the one who benefitted most was Helen because had the plaintiffs relocated to Dover, they would not have been able to provide the daily services to Helen as they had in the past. But that is dependent upon at least a couple of variables. There was no testimony that Helen could not have received services from other sources, including paying for them if necessary. In addition, there was no testimony whatsoever that the plaintiffs had searched the Dover real estate market, nor met with any realtor, nor began negotiations for the

purchase of a home in Dover. Certainly, they might have moved to Dover, * * * or to a location just down the road for that matter. At that point, the only absolute was that plaintiffs could not continue to live where they had been. An argument simply based upon what might have happened is purely speculative and not an argument based on fact. Rather than making a great sacrifice or dramatic change, the plaintiffs' move across the road to Helen McDaniel's property seems to have been the path of least resistance or the most convenient to them.

* * *

Because plaintiffs' acts can be reasonably accounted for in another manner than as having been done in pursuance of a contract, such acts do not constitute part performance sufficient to take the alleged contract out of the operation of the statute of frauds.

(December 30, 2021 judgment, 18-20.)

**{¶54}** When reviewing the evidence, we agree and find Appellants did not establish the exception of part performance via clear and convincing evidence. As fully explained by the court, Christine's conduct was largely unchanged regarding her mother. Christine assisted with her mother's animals and property, assisted with the care of her niece, and drove her mother to various stores, and to-and-from medical appointments both before and after the agreement. This behavior was not a change. The notable difference was Appellants' preparing part of the farm for the placement of their home on it, and the actually locating of their home there and constructing various improvements to it and the surrounding land. This conduct shows a reliance by them on the alleged promise, but it is not unequivocally related to a promise by Helen to give them the farm. Appellants' conduct does not unequivocally show that an oral agreement existed. Although we acknowledge that while Helen appears to have repeatedly told varying people, including Christine, she was "getting the farm" or she was "willing her the farm," these statements are not an enforceable contract.

**{¶55}** As Helen's conduct demonstrates, she wanted to maintain control over the property. Helen's acts of creating various and frequently changing transfer on death affidavits shows she had not committed to giving Christine the farm. When Helen

allegedly promised Christine she was giving her the farm, this transfer on death did not give Christine the entirety of the farm, as Christine claimed, but instead gave Nate a life estate in the farmhouse.  Accordingly, Appellants' sub-arguments A, B, and C lack merit.

Appellants' Sub-argument D

**{¶56}** Appellants' fourth sub-argument claims they were entitled to the remedy of a constructive trust.  They do not, however, identify or explain how or why they should prevail on this argument.

> A constructive trust is a "trust by operation of law which arises contrary to intention and in invitum, against one who, by fraud, actual or constructive, by duress or abuse of confidence, by commission of wrong, or by any form of unconscionable conduct, artifice, concealment, or questionable means, or who in any way against equity and good conscience, either has obtained or holds the legal right to property which he ought not, in equity and good conscience, hold and enjoy. It is raised by equity to satisfy the demands of justice." *Estate of Cowling v. Estate of Cowling,* 109 Ohio St.3d 276, 2006-Ohio-2418, 847 N.E.2d 405, ¶ 19, quoting *Ferguson v. Owens*, 9 Ohio St.3d 223, 225, 459 N.E.2d 1293 (1984).
>
> "A constructive trust is considered a trust because 'when property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee.'" *Id.*, quoting *Ferguson* at 225, 459 N.E.2d 1293. "The party seeking to have a constructive trust imposed bears the burden of proof by clear and convincing evidence." *Id.* at ¶ 20.

*Hurlburt v. Klein*, 9th Dist. Lorain No. 20CA011607, 2021-Ohio-2167, 174 N.E.3d 932, ¶ 8.

**{¶57}** Appellants bear the burden of demonstrating reversible error on appeal.  *Davis v. Wesolowski*, 2020-Ohio-677, 146 N.E.3d 633, ¶ 29 (12th Dist.). It is not an appellate court's duty "to develop an argument in support of an assignment of error."  *Children's Hosp. Med. Ctr. v. S. Lorain Merchants' Assn.,* 9th Dist. Summit No.

22881, 2006-Ohio-2407, ¶ 6, citing *Prince v. Jordan,* 9th Dist. No. 04CA008423, 2004-Ohio-7184, ¶ 40.

**{¶58}** App.R. 16(A)(7) requires an appellant's brief to include "[a]n argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions, with citations to the authorities, statutes, and parts of the record on which appellant relies."

**{¶59}** "Unsupported legal conclusions do not demonstrate error." *In re Complaint of Toliver v. Vectren Energy Delivery of Ohio, Inc.*, 145 Ohio St.3d 346, 2015-Ohio-5055, 49 N.E.3d 1240, ¶ 30. Because this contention is unsupported, we will not construct this argument for him. *Byers DiPaola Castle v. Ravenna City Planning Comm.*, 11th Dist. Portage No. 2010-P-0063, 2011-Ohio-6095, ¶ 35 (disregarding conclusory arguments unsupported in appellant's brief).

**{¶60}** Because Appellants fail to lay out any facts necessary for our disposition of this argument, it is overruled. Notwithstanding, our review of the evidence does not show Appellants established by clear and convincing evidence Appellees acquired title to the farm via wrongful or questionable means such that equity requires the imposition of a constructive trust in Appellants' favor. This argument is overruled.

Appellants' Sub-argument E

**{¶61}** Their sub-argument labeled E contends the trial court's decision, finding they were not entitled to either the farm or financial compensation via promissory estoppel, is against the manifest weight of the evidence. Here, Appellants claim they are entitled to Helen's farm, or alternatively, for the payment of money for the services they rendered to the decedent, e.g., caring for her real property and assisting her personally with errands, etc.

**{¶62}** Regarding this claim, the trial court found in part that promissory estoppel exception did not apply, explaining:

> Fundamentally, plaintiffs face the same difficulty and inability in proving a promise on the part of Helen as they did in proving an agreement or contract. Because the alleged promise in this case is one for the transfer of real estate, plaintiffs also face the requirements of the statute of frauds. In this regard, because there is no evidence, nor even an allegation, that

the defendant, Helen McDaniel's words or actions fit into the very narrow exception to the statute of frauds applied in cases of promissory estoppel, the Court finds that plaintiffs have again failed to meet their burden of proof and their claim as set forth in Count 'G' fails as well.

(December 30, 2021 judgment, 22.)

**{¶63}** To establish a claim for promissory estoppel, one must show: "(1) a clear and unambiguous promise, (2) reasonable and foreseeable reliance by the party to whom the promise is made, and (3) injury by the reliance by the party claiming estoppel." (Citation omitted.) *Trehar v. Brightway Ctr.*, 7th Dist. Jefferson No. 14 JE 20, 2015-Ohio-4144, ¶ 17. "A clear and unambiguous promise is one that the promisor would expect to induce reliance." *Ringhand v. Chaney,* 12th Dist. Clermont Nos. CA2013-09-072, CA2013-09-076, 2014-Ohio-3661, ¶ 20, citing *McCroskey v. State,* 8 Ohio St.3d 29, 30, 456 N.E.2d 1204 (1983).

**{¶64}** First, regarding Appellant's claim for title to the decedent's real property via promissory estoppel, this court has held that promissory estoppel is not an exception to the statute of frauds. *Filo v. Liberato*, 2013-Ohio-1014, 987 N.E.2d 707, ¶ 10 (7th Dist.). Thus, it is not a means to secure real property as damages. *Id.* citing *Olympic Holding Co. v. ACE Ltd.*, 122 Ohio St.3d 89, 2009-Ohio-2057, 909 N.E.2d 93, ¶ 35. Instead, promissory estoppel is a cause of action that may provide another remedy, other than the recovery of an interest in real property, to a party who is injured due to one's reliance on an otherwise unenforceable promise, such as one barred by the statute of frauds. *Id.*

**{¶65}** Thus, promissory estoppel, as a matter of law, does not authorize the remedy of transfer of an interest in land since this would abrogate the statute of frauds. *Id.* This aspect of Appellants' argument lacks merit.

**{¶66}** As for Appellants' claim for money damages to compensate them for the services rendered to Helen based on her alleged promise to give them the farm, we agree with the trial court.

**{¶67}** In an action to recover for services rendered to a family member, the law presumes there was no obligation to pay. This presumption can be overcome by a showing of an express contract for the performance of services for compensation by direct or indirect evidence. Such a contract must be established by clear and convincing

evidence. *Scheetz v. Scheetz*, 47 Ohio App. 37, 38-39, 189 N.E. 859 (5th Dist.1933), citing *Hinkle et al., Ex'rs, v. Sage*, 67 Ohio St. 256, 65 N. E. 999, and *Merrick v. Ditzler*, 91 Ohio St. 256, 110 N. E. 493.

**{¶68}** Here, there was no clear and unambiguous promise relied on by Appellants in helping Helen with her personal matters and caring for her property by which she promised to pay them for her services. Instead, as emphasized by the trial court, Appellants had consistently cared for Helen's needs in seemingly the same manner before and after Appellants relocated and placed their home on Helen's farm.

**{¶69}** Despite the testimony about Helen promising to "will" or give Christine the farm upon her death, there was no evidence or testimony tending to show Helen agreed to pay Appellants for their time and efforts spent caring for her. Because we do not find the trial court clearly lost its way and created such a manifest miscarriage of justice by finding Appellants' promissory estoppel claim lacked merit, their sub-argument E lacks merit.

Appellants' Sub-argument F

**{¶70}** As for the sub-argument F, Appellants claim the trial court erred by failing to find Helen should be equitably estopped from transferring the farm to the Tacys instead of them. Appellants contend the evidence shows Helen acted with malicious intent when she lied to them about promising them the farm, and accepting their assistance, and depriving them of the farm.

**{¶71}** "The purpose of equitable estoppel is to prevent actual or constructive fraud and to promote the ends of justice." *Ohio State Bd. of Pharmacy v. Frantz*, 51 Ohio St.3d 143, 145, 555 N.E.2d 630 (1990). The doctrine of equitable estoppel precludes a party from denying his own acts or admissions that were expressly designed to influence the conduct of another, and did so influence such conduct, when such a denial will injure the other party. *Doe v. Archdiocese of Cincinnati,* 116 Ohio St.3d 538, 2008-Ohio-67, 880 N.E.2d 892, ¶ 7.

**{¶72}** The trial court disagreed with this proposition, explaining: "Christine's testimony regarding what was said was equally offset by other testimony that there was no agreement of any kind. And while plaintiffs point to Helen's actions as proof, her

conduct can reasonably be explained by other means." (December 30, 2021 judgment, 22.)

**{¶73}** We agree with the trial court's decision since it is not against the manifest weight of the evidence. There is no evidence to show Helen promised Appellants her farm to fraudulently induce or bait Appellants into caring for her and relocating onto her property, warranting the invocation of the doctrine of equitable estoppel. Instead, Helen simply changed her mind as to whom she would will her property, and to what extent, depending on which relative was in her good favor at the time. The evidence does not show she was acting with malicious intent and seeking to perpetuate a fraud. Accordingly, this argument lacks merit.

### Appellants' Sub-argument G

**{¶74}** As for sub-argument G, Appellants urge us to find the court erred by not awarding them title to the farm via their action to quiet title. Appellants assert they are entitled to the farm, the benefit of their bargain pursuant to R.C. 5303.01, based on their performance under the parties' oral contract. However, because Appellants' argument in this regard is contingent on the existence of the contract, which we fully addressed under Appellants' sub-argument A, we will not reiterate it here. Under that argument, we agree with the trial court's decision finding no enforceable oral agreement.

**{¶75}** Further, the trial court found Bradley and Todd Tacy were the rightful owners of Helen's property via her final transfer on death affidavit dated May 19, 2017, and pursuant to R.C. 5302.22(C)(1), title to the real property vested in them as the named beneficiaries upon the death of the affiant. (December 30, 2021 judgment, 40.) Appellants do not challenge the viability of Helen's transfer on death affidavit on appeal. Thus, this sub-argument lacks merit.

### Appellants' Sub-argument H

**{¶76}** As for sub-argument H, Appellants contend the trial court erred by failing to find Helen committed fraud and/or fraud in the inducement when she lied to them about giving Christine the farm in exchange for them moving onto her property and caring for her.

**{¶77}** Fraud in the inducement arises when a party is induced to enter an agreement based on a misrepresentation. *Terry v. Bishop Homes of Copley, Inc.*, 9th

Dist. Summit No. 21244, 2003-Ohio-1468, ¶ 21. The fraud or misrepresentation must be made with the intent of inducing the party's reliance. *Id.*

**{¶78}** A successful fraud in the inducement claim requires a plaintiff to establish the elements of fraud:

> "(a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance."

*The Illum. Co. v. Cuyahoga Cty. Court of Common Pleas*, 97 Ohio St.3d 69, 2002-Ohio-5312, 776 N.E.2d 92, ¶ 24, quoting *Russ v. TRW, Inc.*, 59 Ohio St.3d 42, 49, 570 N.E.2d 1076 (1991).

**{¶79}** Appellants claim Helen "must have" known her promise to Christine to give Appellants the farm upon her death in exchange for them relocating onto her property and caring for her, was false and would mislead them. They also assert she intended to mislead them in order to induce them to not relocate, which would result in their inability to meet Helen's daily needs.

**{¶80}** The trial court disagreed. It found Appellants failed to establish Helen induced them to act in this manner in an effort to defraud or mislead them. Instead, the court noted that Appellants' behavior was mostly unchanged regarding their care for Helen, which they had been doing since approximately 1995, after she allegedly promised to give Christine the farm.

**{¶81}** The court found Appellants' fraud-based claims lacked merit because it found no evidence of intent to defraud or mislead the Appellants. In support of its conclusion, the court emphasized this is a case with competing testimony, noting there was no corroboration of Christine's testimony and Appellants' version of the case. On the other hand, Helen's attorney testified about Helen's statements made to him and Helen was "adamant that there was no such agreement." (December 30, 2021 judgment.) The court concluded it was undecided whether Christine and Helen had an agreement, but it

Case No. 22 CA 0956

definitively found there was no tortious, malicious, fraudulent, or reckless conduct by any of the defendants regarding Appellants' placement of their home on Helen's farm.

**{¶82}** We agree that Appellants did not meet their burden of proof, and the trial court's decision is not against the manifest weight of the evidence. Even assuming for the sake of argument that Appellants proved Helen promised to leave them the farm in exchange for their agreement to continue to care for her, and they relied on this promise to their detriment, there is nothing showing Helen did so with the intent to mislead or deceive them or acted reckless in that regard. *Russ v. TRW, Inc., supra.*

**{¶83}** Absent such evidence, we cannot find the trial court clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. This sub-argument lacks merit.

Appellants' Sub-argument I & J

**{¶84}** Appellants' sub-arguments I and J urge for reversal of their fraudulent transfer claim and contend Helen fraudulently transferred her real estate to Appellees in an effort to deprive Appellants from the benefit of their oral contract with her. They also assert the trial court should have voided the transfer of her real property to Appellees in order to satisfy Appellants' claim for services rendered to Helen before she died, pursuant to R.C. 1336.04(A) and 1336.07(A).

**{¶85}** R.C. 1336.07(A) states:

In an action for relief arising out of a transfer or an obligation that is fraudulent under section 1336.04 * * * of the Revised Code, a creditor * * *, may obtain one of the following:

(1) Avoidance of the transfer or obligation to the extent necessary to satisfy the claim of the creditor * * *.

And R.C. 1336.04(A) states in part:

A transfer made or an obligation incurred by a debtor is fraudulent as to a creditor, * * * if the debtor made the transfer or incurred the obligation in either of the following ways:

(1) With actual intent to hinder, delay, or defraud any creditor of the debtor * * *.

As a remedy for a violation of R.C. 1336.04(A), R.C. 1336.07 authorizes a creditor to void certain transfers of property to avoid a fraud. A "creditor" is defined as "a person who has a claim," and "claim" is defined in part as "a right to payment, whether or not the right is reduced to judgment * * *." R.C. 1336.01(C) and (D).

**{¶86}** Here, the trial court overruled these arguments, finding Appellants were not the decedent's creditors because they did not establish they had a meritorious claim against Helen. It found there was no agreement that Helen would pay Appellants money for the care and support they provided to her. The court also found there was no enforceable oral contract obligating Helen to transfer the farm to Appellants when she died. (December 30, 2021 judgment.) In addition, the trial court found Appellants did not establish the defendants acted fraudulently, maliciously, or recklessly regarding "the chain of events that led up to the plaintiffs locating their double-wide manufactured home on the property." (December 30, 2021 judgment, 35.)

**{¶87}** We agree. As explained under the various other sub-arguments, because this court is overruling each of Appellants' arguments challenging the trial court's judgment, we must also conclude and hold Appellants were not Helen's creditors. Thus, R.C. 1336.04(A) and 1336.07(A) are inapplicable.

**{¶88}** Appellants fail to show the trial court's decision is against the manifest weight of the evidence in any manner, and as such, each of Appellants' arguments under this sub-argument is overruled.

<u>Appellants' Second Assignment of Error: Admission of Evidence</u>

**{¶89}** Appellants' second assigned error asserts:

"The trial court committed reversible error and abused its discretion in admitting exhibits H, I, and J over appellants' objections."

**{¶90}** Appellants contend the court abused its discretion by allowing the admission of three exhibits not provided via discovery, resulting in a "trial by ambush." At trial, they objected to the introduction of USDA reports regarding the rental value of the farm because these exhibits were not provided via discovery.

**{¶91}** These exhibits were introduced in support of Appellees' counterclaim for eviction and damages. Appellees sought a finding that Appellants were wrongfully possessing the property and Appellees were entitled to damages as a result, but the trial

– 23 –

court did not find this claim had merit. The trial court overruled Appellants' objection, noting the exhibits were given to their attorney two days before trial, and upon weighing the potential harm, more harm would result from excluding them than the admission. (December 30, 2021 judgment, 7.)

**{¶92}** Trial courts have broad discretion regarding the admission or exclusion of evidence, and we will not overturn the trial court's ruling absent an abuse of discretion. *State v. Sage*, 31 Ohio St.3d 173, 180, 510 N.E.2d 343 (1987). An abuse of discretion is more than an error of law or judgment; it implies the court's attitude was unreasonable, arbitrary, or unconscionable. *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980). Although the introduction of Appellees' exhibits may not have been timely, it was within the trial court's discretion to determine if the evidence should be admitted. *Id.* Moreover, the trial court explained in detail there was no evidence connecting the information in these exhibits to the claims presented in the case:

> Although the defendants' Exhibits "H," "I," and "J," showing the cash rent estimates for non-irrigated, irrigated, and pasture farmland, have been admitted by the Court, there is no testimony or evidence as to the number of agricultural acres or to the nature of the agricultural use to which the land was put. In short, there was no evidence connecting the estimates contained in the exhibits to the land at issue. Neither did the defendants offer any testimony or evidence concerning any lost income which was the result of the plaintiffs' occupation of the property. The Court, therefore, can make no finding regarding damages and no damages are awarded to the defendants on this claim.

(December 30, 2021 judgment, 41.)

**{¶93}** The trial court weighed whether to introduce these exhibits and explained its decision based on reason and logic. It noted that while the timing of the disclosure was not preferred, Appellants nonetheless knew about Appellees' counterclaim since the beginning of the case and were provided the exhibits two days before trial.

**{¶94}** Moreover, Appellants fail to identify any resulting prejudice from the introduction of the untimely exhibits. The trial court did not ultimately rely on these exhibits

in rendering its decision. Thus, we find no abuse of discretion, and Appellants' second assigned error lacks merit.

<u>Appellees' Cross-Assignment of Error: Unjust Enrichment</u>

**{¶95}** Appellees' cross-assignment of error contends:

"The trial court's finding of unjust enrichment is against the manifest weight of the evidence."

**{¶96}** Appellees urge us to find the trial court erred by holding Appellants' "double-wide manufactured home and its various additions * * * add value to Helen's (now Tacy's) farm * * *." (December 30, 2021 judgment, 35.) Appellees contend the trial court erred in finding they received any benefit via the placement of the manufactured home on Helen's farm and there was no evidence the value of the real property increased with the manufactured home located there. For the following reasons, we disagree.

**{¶97}** Unjust enrichment is a claim under quasi-contract law against a person in receipt of a benefit which he is not justly and equitably entitled to retain. *Hummel v. Hummel,* 133 Ohio St. 520, 527, 14 N.E.2d 923 (1938). To prove an unjust enrichment claim, a plaintiff must show (1) a benefit was conferred to plaintiff by defendant; (2) defendant had knowledge of the benefit conferred; and (3) defendant's retention of the benefit without payment to plaintiff would be unjust. *PNC Bank v. Bulldog Asset Recovery*, 8th Dist. Cuyahoga No. 100692, 2014-Ohio-4802, ¶ 14. A successful unjust enrichment claim entitles a party to restitution of the reasonable value of the benefit conferred. *Santos v. Ohio Bur. of Workers' Comp.*, 101 Ohio St.3d 74, 2004-Ohio-28, 801 N.E.2d 441, ¶ 11; *Sammartino v. Eiselstein,* 7th Dist. Mahoning No. 08 MA 211, 2009-Ohio-2641, ¶ 14.

**{¶98}** To warrant reversal from a bench trial under a manifest weight of the evidence claim, we review the record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in evidence, the trial court clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).

**{¶99}** Regarding this claim, the trial court explained:

<u>Case No. 22 CA 0956</u>

What is certain is that the plaintiffs located their double-wide manufactured home onto Helen's property. Here, evidence is clear that Helen knew, or should have known, about the plaintiffs' double-wide manufactured home and its various additions. It is also clear that the plaintiffs' home adds value to Helen's (now Tacy's) farm and that to allow the defendants * * * to retain that benefit without compensation is unjust.

(December 30, 2021 judgment, 35.)

{¶100} At trial, Appellees argued Appellants' home was movable, personal property. Appellees asked the court to order Appellants to remove it because Appellees did not want it. Appellants, on the other hand, introduced evidence showing the value of the home with the addition. They also provided evidence detailing the expenses related to relocating it; it was permanently affixed to the real property; and a loss of money and materials would result from the home's removal from the farm.

{¶101} As stated previously, Robert Garrett of Garrett Construction testified he constructed the two-bedroom addition to Appellants' manufactured home, along with a roof connecting it to the home. The roof also extended over Appellants' porch and ramp they had built for Helen. Appellants paid $15,000 for the addition. Garrett recommended against moving the manufactured home because it would result in a loss of the addition, roof, and ramps. He said it would be a loss of materials and money. He explained the home was anchored to the ground in too many places to warrant relocating it. Nonetheless, he estimated it would cost approximately $45,600 to tear down the addition and relocate the manufactured home.

{¶102} Appellants introduced exhibits detailing the value of the farm and separately estimating the value of their home. Appellees did not oppose these exhibits, and their counsel stipulated to admissibility.

{¶103} Plaintiffs' exhibit 13 is a Newell Realty estimate of the real property dated February of 2018. This appraisal describes Helen's farm as 82 acres and states it includes the farmhouse and bank barn. The appraisal excludes Appellants' manufactured home and mineral rights. Exhibit 13 states the fair market value of the real property, including the farmhouse and barn, is $274,700. (Plaintiffs' exhibit 13.)

{¶104} Plaintiffs' exhibit 15 is another Newell Realty estimate. It appraises the value of the manufactured home, including the two-bedroom addition, which total 2,240 square feet. This appraisal excludes the surrounding concrete, ramp, and decks. It also excludes the mineral rights. It is dated March of 2017 and indicates the appraised value of the home with the addition is $112,000. (Plaintiffs' exhibit 15.)

{¶105} The court found Garrett's testimony credible and convincing. It found the home was so affixed to the real estate that it was permanent, stating: "While the double-wide manufactured home still technically remains personal property at this time, it is hardly movable." (December 30, 2021 judgment, 35.) The court also emphasized the substantial expense connected with moving the home, in addition to a substantial loss in materials from aspects of the home that were not salvageable, such as the roof, ramp, and porch. Garrett explained it was not feasible to relocate the manufactured home.

{¶106} The trial court also noted Newell Realty was a "well-respected, local realtor and auctioneer with whom the Court is most familiar." (December 30, 2021 judgment, p. 36.) The court found Helen's estate, her beneficiaries, and Appellees, benefited as a direct result of Appellants placing their home on Helen's farm.

{¶107} Thus, based on the court's determination that it was permanently affixed to the real estate, the court directed Appellees to pay Appellants $112,000, its estimated value. In addition, Appellants were ordered to execute and deliver the certificate of title to their manufactured home located on the property to Appellees. (December 30, 2021 judgment, 36-37, 44-45.)

{¶108} In light of the evidence and the court's explanation, we cannot find the trial court's judgment is against the manifest weight of the evidence. To the contrary, Appellants presented evidence showing Helen's estate, and consequently, Appellees as her beneficiaries, were benefitted via the placement of the home and the construction of the addition on Helen's farm. Appellants both testified Helen was well aware they were placing their home on her property. They explained she was present for the clearing of the land, the delivery and placement of the home, and the construction of the addition, which was at her urging so Christine could secure custody of Nate's children. Appellants also provided testimony and exhibits showing the value of the home and the addition, separate and apart from the real property. *Crawford v. Hawes*, 2013-Ohio-3173, 995

N.E.2d 966, ¶ 34 (2d Dist.) ("Unjust enrichment entitles a party only to restitution of the reasonable value of the benefit conferred"). Appellees did not offer evidence showing an alternative or lower value as the "benefit conferred."

{¶109} The evidence supports a finding that Helen's estate, and consequently, Appellees were unjustly enriched by the placement of Appellants' home and the addition on the family property, and it would be unjust for the estate and Appellees to retain that property without compensating Appellants for their loss, the value of their home and addition. Accordingly, we do not find the trial court's decision is against the manifest weight of the evidence. Appellees' sole cross-assignment of error lacks merit and is overruled.

## Conclusion

{¶110} For the foregoing reasons, Appellants' two assignments of error lack merit, and Appellees' cross-assignment of error also lacks merit. The trial court's decision is affirmed.

Waite, J., concurs.

Hanni, J. concurs.

Case No. 22 CA 0956

_____

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas, Probate Division of Carroll County, Ohio, is affirmed.  Costs to be taxed against the Appellants.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**