# IN THE COURT OF APPEALS OF OHIO

SEVENTH APPELLATE DISTRICT
BELMONT COUNTY

DURR FARMS, LLC,

Plaintiff-Appellee,

v.

SILTSTONE RESOURCES, LLC, ET AL.,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 24 BE 0050**

---

Civil Appeal from the
Court of Common Pleas of Belmont County, Ohio
Case No. 21-CV-170

**BEFORE:**
Katelyn Dickey, Cheryl L. Waite, Carol Ann Robb, Judges.

---

**JUDGMENT:**
Reversed.

---

*Atty. Molly K. Johnson,* Johnson & Johnson Law Offices, for Plaintiff-Appellee and

*Atty. Andrew P. Lycans,* Critchfield, Critchfield & Johnston, LTD, for Defendant-Appellant.

Dated:  May 29, 2025

---

**DICKEY, J.**

{¶1} Appellant, Siltstone Resources, LLC ("Siltstone"), appeals two judgment entries of the Belmont County Court of Common Pleas: the first granting Appellee's, Durr Farms, LLC ("Durr Farms"), motion for summary judgment on its claims for fraudulent inducement and breach of warranty deed, and denying Siltstone's cross-motion on the same; and the second awarding compensatory and punitive damages, attorney fees and costs to Durr Farms. Prior to the conveyance of the surface of a 143-acre property in Wheeling Township ("Property") from Siltstone to Durr Farms, Siltstone failed to disclose a recorded easement previously granted by Siltstone to a related entity, Siltstone Services, LLC ("Siltstone Services"). The easement cedes authority to Siltstone Services to make various decisions regarding the surface of the Property.

{¶2} In this appeal, Siltstone argues the easement was a matter of public record, and as a consequence, Durr Farms cannot prove any of the elements of its fraud in the inducement claim. Next, Siltstone argues the trial court abused its discretion in quashing Siltstone's subpoena to depose Durr Farms' counsel, Attorney Molly Johnson ("Attorney Johnson"), who represented Durr Farms during the sale of Property, then served as Durr Farms' trial counsel, and is its current appellate counsel. Third, Siltstone argues the trial court should not have considered parol evidence that contradicts the plain language of the deed in entering judgment in favor of Durr Farms on its breach of warranty deed claim. Finally, Siltstone argues the trial court abused its discretion in awarding damages, attorney fees, and costs to Durr Farms.

{¶3} Because the easement was a matter of public record, we reverse the entry of summary judgment in favor of Durr Farms on its fraud in the inducement claim and enter judgment in favor of Siltstone. Because the deed specifically excepts easements of record from the limited warranty, we reverse the entry of summary judgment in favor of Durr Farms on its breach of warranty deed claim and enter judgment in favor of Siltstone. Finally, we reverse the judgment entry awarding compensatory and punitive damages, and attorney fees and costs to Durr Farms.

## SUMMARY JUDGMENT STANDARD

{¶4} This appeal is from a trial court judgment resolving a motion for summary judgment. An appellate court conducts a de novo review of a trial court's decision to grant summary judgment, using the same standards as the trial court set forth in Civ.R. 56(C). *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105 (1996). Before summary judgment can be granted, the trial court must determine that: (1) no genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing the evidence most favorably in favor of the party against whom the motion for summary judgment is made, the conclusion is adverse to that party. *Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 327 (1977). Whether a fact is "material" depends on the substantive law of the claim being litigated. *Beckett v. Rosza*, 2021-Ohio-4298, ¶ 21 (7th Dist.).

{¶5} "[T]he moving party bears the initial responsibility of informing the trial court of the basis for the motion, and identifying those portions of the record which demonstrate the absence of a genuine issue of fact on a material element of the nonmoving party's claim." (Emphasis deleted.) *Dresher v. Burt*, 75 Ohio St.3d 280, 296 (1996). If the moving party carries its burden, the nonmoving party has a reciprocal burden of setting forth specific facts showing that there is a genuine issue for trial. *Id.* at 293. In other words, when presented with a properly supported motion for summary judgment, the nonmoving party must produce some evidence to suggest that a reasonable factfinder could rule in that party's favor. *Doe v. Skaggs*, 2018-Ohio-5402, ¶ 11 (7th Dist.).

{¶6} The evidentiary materials to support a motion for summary judgment are listed in Civ.R. 56(C) and include the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact that have been filed in the case. In resolving the motion, the court views the evidence in a light most favorable to the nonmoving party. *Temple*, 50 Ohio St.2d at 327.

**FACTS AND PROCEDURAL HISTORY**

{¶7} Durr Farms is a single member Ohio limited liability company wholly owned by Duane A. Durr ("Durr"). Durr owns a farm adjacent to the Property.

{¶8} Durr was born in 1938 and suffers from extreme hearing loss. Durr does not communicate by way of electronic mail. He testified as Durr Farms' Civil Rule 30(B)(5) representative.

{¶9} Attorney Johnson has represented Durr for four or five years. (Durr Dep., p. 14.) They have developed a system of communication due to his infirmity whereby Durr schedules frequent meetings at Attorney Johnson's law office. (*Id.* at p. 50-52.) During the meetings, Durr authorizes Attorney Johnson to communicate via electronic mail on his behalf. Durr then returns for a subsequent office meeting, where he reads the electronic mails sent and received by Attorney Johnson since his previous visit, and provides further instruction. (*Id.* at p. 161.) Durr explained the system requires all of Attorney Johnson's communications to be "visual." (*Id.* at p. 85.)

{¶10} Durr has purchased eight to ten properties throughout the state of Ohio during his lifetime. However, he testified he typically undertook title searches in the past *after* he purchased a property. When asked if there was information about the Property he wanted to know prior to closing, he responded, "[y]ou hire counsel because you're hiring their expertise and you are relying on counsel being factual and educated on the subject." (*Id.* at p. 55.)

{¶11} At his deposition, Durr explained he had an interest in acquiring the Property as early as 1998, because it would provide additional highway access to his existing property and could be used for hunting and timber, as well as growing hay. He was aware the Property contained mining acid, which negatively impacts tree growth. (*Id.* at p. 44-46.)

{¶12} Durr confirmed at the trial on damages that he wanted to acquire the Property for the following reasons:

> It was adjacent to property [Durr] already owned. It had access to
> Route 9 which gave [him] access to more acreage. It had some land that

was available to grow hay on and possibly, maybe [someday], crops. It had some timber on it. It had entertainment, hunting, fishing possibilities.

(9/7/24 Trial on Damages, p. 8-9.)

{¶13} Despite Durr's awareness that the Property had been strip-mined, he expressed for the first time at the trial on damages his desire to build on the Property:

The reason being that I kind of lost my prime abutting lot on the other property I owned because they put a well pad in. So I was looking for a place to put a house that would be rural and I wouldn't be looking at an industrial complex.

(*Id.* at p. 9.) Durr added that he considered leasing and renting the Property as well. (*Id.*) Despite the limited purposes for the Property described by Durr at his deposition, he characterized the possibilities for the Property at the hearing on damages as "endless." (*Id.*)

{¶14} Siltstone acquired the Property in 2014. Roughly five years later, Siltstone granted the Easement and Right-of-Way at issue in this case ("Easement") to Siltstone Services, which was executed and recorded on February 22, 2019. The ten-year Easement vests Siltstone Services with the right to grant surface-related encumbrances.

{¶15} The Easement's first paragraph grants, in pertinent part:

[A]n exclusive easement and right-of-way . . . for the limited purposes of locating, relocating, constructing, installing, operating, maintaining, inspecting, repairing, modifying, replacing in whole or in part, excavating, removing and abandoning one or more well pads and/or pipelines for gathering and transporting oil, gas and their associated constituents, or other substances, including but not limited to water. . .

The Easement further grants to Siltstone Services the right to, "grant, convey and assign to third parties, from time to time, all future easements and rights-of-way, whether temporary, perpetual, permanent, exclusive or non-exclusive . . . in, on, over, under, across and through the Property."

Case No. 24 BE 0050

**{¶16}** The Easement describes Siltstone Services' right to "permanently displace" an unlimited number of acres of the Property. It expressly prohibits the surface owner from executing its own easements or rights of way as a covenant running with the land, without prior approval of Siltstone Services. However, the Easement prohibits Siltstone Services from unreasonably withholding its approval.

**{¶17}** The Easement prohibits the surface owner from erecting any building or structure within the Easement, but permits the surface owner to use the Property for "all residential, agricultural, recreational, commercial and industrial purposes," unless the proposed purposes are "inconsistent with or endanger, obstruct, impair, injure or interfere with, the Easement." An amendment to the Easement ("Amendment") (collectively "Easement"), recorded on May 14, 2019, was intended to clarify that structures could be erected on the Property that do not interfere with the then existing use of the Easement at the time the building or structure is erected. (Michael Faust Dep., p. 74-75.)

**{¶18}** The Easement and Amended Easement were both executed by Attorney Michael Faust ("Attorney Faust"), who is the authorized representative of both Siltstone and Siltstone Services. Attorney Faust is a founding member and equity partner of Siltstone. (*Id.* at p. 10-11). He describes his role with Siltstone as "overseeing the acquisition of mineral rights and real estate in the Appalachian Basin, Ohio, Pennsylvania and West Virginia." (*Id.* at p. 10, 21-22).

**{¶19}** During his deposition, Attorney Faust testified the Easement, "give[s] [Siltstone Services] the right to convey easements and rights-of-ways to third parties." (*Id.* at p. 33.) He further testified Durr Farms cannot sign any third-party agreements, "without [Siltstone Service's] prior written consent." (*Id.* at p. 32). Attorney Faust testified, "[Siltstone Services] constructed the [E]asement in a way that would preserve the future right-of-way value for [Siltstone Services], but still allow the current owner to develop the property as they see fit." (*Id.* at p. 69.) Attorney Faust further testified, "money exchanged hands" between Siltstone and Siltstone Services for the execution of the Easement. (*Id.* at p. 71.)

**{¶20}** Beginning in June of 2020, roughly one year after the execution of the Amendment, the parties to this appeal engaged in negotiations for the purchase/sale of

the Property exclusively via electronic mail. The following is the electronic mail negotiation between Attorney Johnson (on behalf of Durr Farms) and Attorney Faust.

06/15/2020 by Attorney Johnson:

I got your contact information from Blaine Grace at Gateway. The principals of Gateway are longtime family friends and clients. I've got a client in Belmont County who has heard that you're selling some surface ground. He's interested in buying it for hunting. Looks like 81 acres and PPN 50-00477.000. I'm assuming it won't come with mineral rights. Can you give me a breakdown of what you're looking for as well as what the surface is like? Sounds like maybe reclaimed coal ground? Any flat spots? Any pipelines? Etc.

06/19/2020 by Attorney Faust:

We own this parcel and two adjacent parcels that together are 143 acres. For the 143 acres, we are asking $279,900. There is some good level ground included in this acreage, as well as road frontage (see attached). There is a [Right of Way] easement on the property that runs along the perimeter near the road [("Blue Racer pipeline ROW")]. I do not believe this would be a problem for hunting on the property or building on the property.

06/24/2020 by Attorney Johnson:

First, [Durr would] like to take his ATV (Ranger- golf cart style) for a brief ride around the property. He waives any liability to you and would take his ride at his sole risk without disturbing anything on the property. Second, if you can shoot us over full copies (obviously not just memos) of the current lease and pipeline [Right of Ways] that would be great.

06/24/2020 by Attorney Faust:

I am happy to provide a copy of the [Blue Racer pipeline ROW] and a redacted version of the lease (the Lease is a part of a larger confidential

package with the Lessee), which would show all provisions that may impact the surface owner of the property (We have done this previously with other surface sales). I would, however, prefer to wait and see what the offer is from your client prior to expending the resources to redact the lease and share the [Blue Racer pipeline ROW].

06/25/2020 by Attorney Johnson:

We are happy to sign your release of liability. Please forward it along. Whatever makes you comfortable re: the lease and [Blue Racer pipeline ROW] is fine. We care most about surface terms obviously.

06/27/2020 by Attorney Faust:

Please see attached release of liability, along with Lease and [Blue Racer pipeline ROW] Agreement. [MarkWest Pipeline Agreement and Oil and Gas Lease attached]

06/27/2020 by Attorney Johnson:

Please see attached release of liability, along with Lease and [Blue Racer pipeline ROW] Agreement.  [MarkWest Pipeline Agreement and Oil and Gas Lease attached]

07/06/2020 by Attorney Johnson:

[Durr] would like to know two things about the existing [Blue Racer pipeline ROW]: what payment is required for any additional pipelines, and what size is the existing pipeline that was installed. [Executed Purchase and Sale Agreement attached for below asking price.]

07/13/2020 by Attorney Faust:

After much discussion internally and with our realtor, we came to the conclusion that our list price of an implied $2,000 per acre is a fair and

reasonable price for the market. That said, we would be willing to lower the price to $1,750/acre ($251,489) assuming the Buyer is willing to take the property subject to all leases and right of ways of record. [Unexecuted Purchase and Sale Agreement attached that describes a Quitclaim Deed for a sale price of $251,489.]

07/15/2020 by Attorney Johnson:

[Durr] would agree to you retaining all oil and gas minerals (and associated hydrocarbons which would come up through any well bore) but would like you to affirmatively grant the surface considerations under the lease (and any future leases) to [Durr]. He wants to ensure that the Lessee would consult with him regarding surface locations and that he would receive all surface damage payments no questions asked. I can't imagine that would bother you. I previously drafted some language to that effect in my Purchase and Sale Agreement but would welcome any reasonable amendments thereto. [Durr] also wants to avoid mining on the property, so we'd need to address the remaining hard minerals (I believe the coal is gone, this would relate to sandstone, limestone, etc.) in a mutually beneficial way. Our preference would be to retain them, of course, but we could perhaps settle for a no strip-mining clause. A warranty deed and a special by through and under warranty that Siltstone is not aware of any outstanding environmental issues on the property – otherwise, your As Is clause is fine.

07/20/2020 by Attorney Faust:

The mineral reservation would need to be for all minerals, as well as all rights under Ohio law that reserved mineral owners have. That said, we would be willing to allow the surface owner to retain all damage payments owed for any surface operations performed under the lease. We would agree to give the surface owner control over surface disturbances that occur under the lease, but not veto power. Meaning, surface owner could dictate most advantageous place for a pad site or pipeline to be placed, but could

not veto the pad site or pipeline from being placed anywhere on the property. The surface owner would also be paid any surface damage reimbursement in line with the market value of the property, but any additional compensation negotiated by the reserved interest owner, would go to the reserved interest owner. For instance, the Buyer is paying $1,750/acre. If we are [able] to negotiate $5,000/acre for a pad site, then the surface owner would receive $1,750/acre and we would receive the balance.

07/21/2020 by Attorney Johnson:

As promised, here is an updated and executed PSA. The only condition [Durr] would not approve is Siltstone receiving the overage surface payment per acre. Please note that I have edited only two paragraphs herein: Paragraph 2 (you'll see this easily enough), and the end of paragraph 5, relating to the limited warranty deed.

07/30/2020 by Attorney Faust:

Regrettably we will need to decline the Buyer's offer. At the Buyer's current price, we are unwilling to forego future Right of Way value outside of the lease. In order to do that, we would need someone to purchase the property at our full listing price of $2,000/acre.

08/25/2020 by Attorney Johnson:

I just met with my client for the first time in quite a while. He has instructed me to increase his offer to $1,850/acre removing the shared proceeds of future surface development. Please let me know if this is acceptable on your end.

10/22/2020 by Attorney Johnson:

[Executed Purchase and Sale Agreement **for full asking price**, removing shared proceeds of future surface development clause attached.]

Case No. 24 BE 0050

10/28/2020 by Attorney Faust:

[Countersigned Purchase and Sale Agreement attached.]

(Emphasis added.)

**{¶21}** During the roughly four-month negotiation, Attorney Faust did not disclose the existence of the Easement. According to his deposition testimony, Siltstone owns "dozens of surface properties and have had several different types of encumbrances on different properties, and [he is] not able to remember all of the properties and all of the details of what's on each property." (Faust Dep., p. 44.) Further, Attorney Faust reasoned Durr Farms was responsible for performing its due diligence with respect to title. Attorney Faust testified he reviews title before executing a purchase and sale agreement when Siltstone is the purchaser, not when Siltstone is the seller. (*Id.* at p. 62.) Finally, Attorney Faust testified Attorney Johnson specifically asked for pipeline right-of-ways, and he does not consider the Easement to be a right-of-way. (*Id.* at p. 52.)

**{¶22}** The Purchase and Sale Agreement ("PSA") was executed by Durr Farms on September 29, 2020, and by Siltstone on October 28, 2020. Paragraph five of the PSA provided thirty days to Durr Farms to investigate the title to the Property with closing scheduled seven days thereafter.

**{¶23}** Paragraph five provides Siltstone will deliver to Durr Farms a "Limited Warranty Deed." However, paragraph two reads, in relevant part:

> This agreement covers the surface estate only; and, the Property shall be conveyed subject to all reservations, exceptions, easements, rights-of-way, restrictions, limitations, contracts and other burdens or instruments which are of record in real property records of the county where the Property is located or of which Buyer has constructive notice.

**{¶24}** Paragraph three contains an "as is" provision, which reads in its entirety:

> THE PROPERTY WILL BE CONVEYED BY SELLER AND ACCEPTED BY BUYER "AS IS," IN ITS PRESENT PHYSICAL CONDITION, WITH ALL FAULTS AND DEFECTS, LATENT OR PATENT,

Case No. 24 BE 0050

KNOWN OR UNKNOWN. SELLER MAKES NO REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, ORAL OR WRITTEN, AS TO TITLE, POSSESSION, QUIET ENJOYMENT, MERCHANTABILITY, MARKETABILITY, USABILITY, HABITABILITY, FITNESS OR SUITABILITY FOR ANY PARTICULAR PURPOSE, OR ENVIRONMENTAL CONDITION OF THE PROPERTY OR AS TO ANY OTHER MATTER RELATING TO THE PROPERTY. IMPLIED WARRANTIES AND ORAL STATEMENTS ARE EXPRESSLY DISCLAIMED AND EXCLUDED. SELLER SPECIFICALLY DISCLAIMS THE VERBAL OR WRITTEN STATEMENTS OR INFORMATION INCLUDING REPRESENTATIONS AND WARRANTIES THAT MAY HAVE BEEN MADE OR PROVIDED BY AGENTS, BROKERS, INVESTORS, OR OTHER THIRD PARTIES.

**{¶25}** Paragraph 13 contains an integration clause. It reads, in relevant part, "[n]o oral warranties, representations, or promises have been made or relied upon by either Party as an inducement to or modification of this Agreement."

**{¶26}** Showcase Title Agency ("Showcase Title") issued the title insurance to Durr Farms. When Durr was asked, "[d]id you personally hire a title company or title agency in connection with this transaction," Durr responded, "I think I remember doing it through [Attorney Johnson]." (Durr Dep., p. 91.) Durr further conceded he had no contact with Attorney Dan Balgo ("Attorney Balgo"), the owner of Showcase Title, or any Showcase Title employee, and no familiarity with Attorney Balgo or Showcase Title prior to its engagement.

**{¶27}** Attorney Johnson's November 5, 2020 electronic mail to Attorney Balgo reads, in relevant part, "I understand you might be interested in doing the title search and underwriting a title policy for a purchase and sale agreement in Belmont County." Attorney Balgo asks if Showcase Title will also be closing, to which Attorney Johnson responds, "Yes please."

**{¶28}** At his deposition, Attorney Balgo explained the first step of issuing a policy of title insurance is to create an abstract of title (title search), which allows Showcase Title to generate a commitment outlining the terms and conditions of the title insurance policy,

including coverage amounts, exclusions, and limitations. The information is then entered into a cloud-based title portal, which facilitates distribution of the information to the lender.

**{¶29}** Attorney Balgo testified he would only provide the results of a title search in a cash sale if the purchaser specifically requested a copy. (Balgo Dep., p. 12.) Attorney Balgo explained he understood Attorney Johnson's November 5th request for a title search to be solely for the purpose of acquiring title insurance.

**{¶30}** When asked if there is a difference between a request for a title search and a request for title insurance, Attorney Balgo explained:

> Yes, because I have – there are banks that will put in a title order with us that do not request title insurance. They simply want a title search done. And in that case, we would generate a title report and issue – and send that to the person that requested that.

(*Id.* at p. 13.)

**{¶31}** At Attorney Balgo's deposition, Attorney Johnson asked if her November 5th electronic mail specifically requested *both* a title search and title insurance. Attorney Balgo responded:

> It reads, title search and underwriting title policy. But again, when I get a title commitment as a title agent and people say that, banks do that all the time. They'll list the things that they want and they need. My assumption is, is that you're saying I want a title policy for this transaction, and do what you need to do, which includes a title search.
>
> I don't know that it specifically asked me in this [electronic] mail, hey, can you do a title search and show me the results. Can you make sure you identify all the easements and right-of-ways and the pipelines? It just says title search, and it's read in one sentence. It doesn't say title search, comma, title policy, comma. It's all read in one.
>
> And in my reading of it – at least at the time. I understand now. But at least at the time, it was, okay, you want me to do what I do on every other

file, which is I'm going to issue a title policy. I need to have a title search to support my title policy.

(*Id.* at p. 37-38.)

{¶32} Later in his testimony, Attorney Balgo observed easements and rights-of-way are not encumbrances on title as they do not affect marketability. (*Id.*, at p. 49.) Attorney Balgo conceded no easements or rights-of-way were included in the title commitment. (*Id.* at p. 52.)

{¶33} Schedule B to the title insurance policy, captioned, "Exceptions From Coverage," reads, in relevant part,

This policy does not insure against loss or damage . . . which arise by the reason of:

4. Oil, gas, coal and other mineral interest together with the rights appurtenant thereto whether created by deed, lease, grant, reservation, severance, sufferance or exception.

. . .

7. Subject to any oil and/or gas lease, pipeline agreement, or other instruments related to the production or sale of oil or natural gas which may arise subsequent to Date of Policy.

{¶34} With respect to Schedule B, Attorney Balgo explained:

[W]hen we started seeing the influx of oil and gas and things in Belmont County, Old Republic [National Title Insurance Company] added a standard exception to deal with oil, gas, other lease, reservations, severance. And that, in my mind, is a standard exception saying we're not going to cover anything in this policy dealing with oil and gas, again, leases, ownership, mineral extraction, those types of things.

When that came about, it was my understanding that there was a total exclusion of anything dealing with oil and gas and mineral interest related to us issuing title insurance.

(Balgo Dep., p. 53.)

**{¶35}** An "Attorney Title Opinion" on "Balgo Law Offices LLC" letterhead reads the title to the real estate is clear. However, the Opinion recognizes the Easement under the heading "Easements/Restrictions." Attorney Balgo testified the document is prepared for in-house purposes solely for purposes of issuing title insurance.

**{¶36}** When Durr was asked if he conducted "due diligence," he responded his due diligence was visiting the Property and inspecting it. He discovered some land that would be conducive to growing hay and also discovered some potential farm land. Durr conceded he expected no profits from the ventures, and typically purchased property because it increases in value over time. Durr was aware of the Blue Racer pipeline ROW because he engaged in negotiations with East Ohio Gas regarding his adjacent property, but East Ohio Gas ultimately installed the pipeline on the Property.

**{¶37}** Durr conceded he did not consult the public records prior to purchasing the Property. He further conceded he made no effort to ascertain the recorded encumbrances on the Property prior to executing the PSA. Finally, Durr admitted the PSA was contingent on a title examination and current contracts on the Property.

**{¶38}** When Durr was asked if he asked Attorney Johnson to check the public records, Attorney Johnson objected to the question on the basis of attorney/client privilege. When asked if Attorney Johnson checked the public records, Durr responded, "[m]y assumption would be that she did . . . I wasn't hand-in-hand going down to the recorder's office, but I hired her to do a job and I'm assuming she does her job." (Durr Dep., p. 76-77.)

**{¶39}** Later in his deposition, Durr testified Attorney Johnson "hired a guy" to conduct a title search after closing. (*Id.* at p. 84.) Durr could not recall whether Attorney Johnson engaged a title agency to conduct a search prior to closing.

**{¶40}** Durr conceded he purchased the Property subject to all recorded easements pursuant to the plain language of the PSA and the deed. He further conceded

the integration clause foreclosed his reliance on oral representations made prior to the execution of the PSA.

**{¶41}** Although Durr could not recall reviewing a title search prior to closing, he testified he believed Attorney Johnson would have shared it with him if she had received a copy based on their relationship. (*Id.*, p. 101.) Nonetheless, Durr later testified that he believed Attorney Johnson reviewed a copy of the title search prior to closing. (*Id.* at p. 117.) Durr met with Attorney Johnson roughly a week before closing to review paperwork pertaining to the sale. (*Id.* at p. 112.)

**{¶42}** On November 24, 2020, Durr executed the closing paperwork, including a title insurance policy written by Showcase Title for insurer Old Republic National Title Insurance Company ("Old Republic"). Showcase Title failed to list anything on the "exceptions from coverage" page, including the Easement, the oil and gas lease, and the Blue Racer pipeline ROW. (*Id.*)

**{¶43}** At closing, Durr Farms received the deed, captioned, "Limited Warranty Surface Deed" ("Deed") from Siltstone, which reads, "[t]his Limited Warranty Surface Deed . . . conveys only the surface of the Property." The Deed continues, "[a]ll surface damage payments . . . pursuant to any existing or future contract for mineral development shall be payable to the surface owner at the time of surface disruption." In exchange for the Deed, Durr Farms initiated a wire transfer to Showcase Title at closing on November 5, 2020. The full asking price of $287,416 was tendered to Siltstone immediately thereafter.

**{¶44}** The Deed contains the following provision:

> This Deed is made subject to the terms and conditions of that certain Purchase and Sale Agreement dated October 28, 2020, by and between Grantor and Grantee, which terms and conditions are hereby incorporated herein, and this conveyance is further made subject to all conditions, reservations, exceptions, easements, rights-of-way, restrictions, limitations, contracts and other burdens or instruments which are of record in the real property records of the county where the Property is located, and all other matters which may be disclosed or discoverable by a visible or physical inspection of the Property.

Case No. 24 BE 0050

The deed also parrots the "as is" provision from the PSA.

{¶45} Despite the fact that Durr said he did not review the title search or title insurance, he testified:

> The irony of this case is when I bought the [P]roperty from Siltstone, I was amazed at how clean it was and I was happy about it. All properties don't sell that clean. Maybe that was supposed to raise a red flag, but it didn't. I was a happy camper.

(Durr Dep., p. 207.) It is not clear whether Durr was commenting on the title insurance prior to or after closing.

{¶46} When asked why he sued Siltstone, Durr responded, "because [Siltstone] hid [the Easement.] [Siltstone] made it look like the title was clear but it wasn't." (*Id.* at p. 215.) Durr alleged Showcase Title did not find the Easement because Siltstone concealed it.

{¶47} On Wednesday, December 9, 2020, approximately two weeks after closing, Attorney Johnson received an electronic mail from MarkWest, a pipeline company, alerting her to the existence of the Easement. Attorney Johnson asked Showcase Title for a copy of the title insurance policy provided to Durr Farms.

{¶48} Durr Farms filed a title insurance claim based on Showcase Title's failure to disclose the Easement, but the claim was denied. As a consequence, Durr Farms filed this action against Siltstone for fraudulent inducement and breach of warranty deed, and against Showcase Title and Old Republic for negligence and breach of fiduciary duty.

{¶49} During the course of discovery, Durr Farms retained Eastern Ohio Title Agency to conduct a title search and create a report of the entirety of the chain of title to the Property. The search revealed a number of encumbrances on the Property including the Easement, a warranty deed defective for lack of marital status, a Columbia Gas right-of-way, and an Easement for Highway Purposes. Durr Farms twice amended its complaint to incorporate the additional encumbrances not disclosed by Showcase or Old Republic in the title insurance. The additional encumbrances listed in Durr Farms' Second

Amended Complaint also appear in the abstractor notes and Attorneys Title Opinion produced by Attorney Balgo.

{¶50} Discovery revealed Showcase Title performed a full title search on the Property prior to the issuance of title insurance. At Attorney Balgo's deposition, Attorney Johnson asked if someone at Showcase Title made a decision to exclude the Blue Racer pipeline ROW and the Easement from the list of exceptions to coverage. Attorney Balgo responded, "Yeah. I did." (Balgo Dep., p. 69.) Attorney Balgo explained:

> So looking at the abstract notes to the right-hand column, we identified the [Easement] and then we identify as a lease the Salt Fork Operating LLC, and [Amended Easement]. I assume those are documents that we're talking about. And her hand writing says Salt Fork, but I think it means Siltstone.
>
> So as to those, again, my understanding was is [sic] that if it's oil and gas pipeline related, it has nothing to do with marketability of title that I need to list as a specific exclusion, because it would be covered by our boilerplate exclusion that's contained in our schedule. So I made that decision at that time, not only on this particular one, but any other pipeline agreement, easements, memorandum of oil and gas we would not list on our schedule as an exclusion.

(*Id.* at p. 70.) Attorney Balgo explained he would include a hypothetical right-of-way through the middle of the Property in the list of exceptions, but would not include a highway easement from the department of transportation. (*Id.* at p. 71.)

{¶51} On April 3, 2022, Durr, Showcase Title, and Old Republic filed an agreed judgment entry dismissing the fiduciary duty and negligence claims based on a settlement between the parties.

{¶52} On November 18, 2022, Siltstone issued a subpoena to Attorney Johnson to appear for deposition, which Attorney Johnson moved to quash on December 16, 2022. The trial court granted the motion to quash on April 18, 2024.

**{¶53}** The parties filed cross motions for summary judgment. On August 30, 2024, the trial court granted Durr Farms' motion and denied Siltstone's motion. Because Durr Farms had moved for judgment on liability only, the trial court set a bench trial for the purposes of determining Durr Farms' damages for September 17, 2024.

**{¶54}** On September 18, 2024, following the bench trial on damages, the trial court awarded compensatory damages in the amount of $158,416, punitive damages in the amount of $80,184, and attorney fees and costs in the amount of $40,092.20. With respect to the punitive damages award, the trial court opined:

> The Court finds that Siltstone's fraud was aggravated, egregious and/or reckless. The Court makes this determination based upon Siltstone's familiarity with the purchase and sale of land in Ohio, the fact that Siltstone's representative was an attorney whom [sic] clearly knew the consequences of his misstatements and concealment, the blatancy of Siltstone's conduct and Siltstone's continued insistence that it did nothing wrong.

(10/16/24 J.E. on Damages, p. 6.)

**{¶55}** This timely appeal followed.

## ANALYSIS

**{¶56}** The assignments of error are taken out of order, as our resolution of the first and third assignments of error render the second and fourth assignments of error moot.

## ASSIGNMENT OF ERROR NO. 1

**THE TRIAL COURT ERRED IN HOLDING THAT DURR PROVED FRAUDULENT INDUCEMENT.**

**{¶57}** Fraud in the inducement arises when a party is induced to enter an agreement based on a misrepresentation. *Matter of Estate of McDaniel*, 2023-Ohio-1065, ¶ 77 (7th Dist.). The fraud or misrepresentation must be made with the intent of inducing the party's reliance. *Id.* " 'The fraud relates not to the nature or purport of the [contract],

but to the facts inducing its execution. . . .' " *ABM Farms, Inc. v. Woods*, 81 Ohio St.3d 498, 502 (1998), quoting *Haller v. Borror Corp.*, 50 Ohio St.3d 10, 14 (1990).

**{¶58}** In order to establish the intentional tort of fraud in the inducement, a plaintiff must prove:

"(a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance."

*McDaniel* at ¶ 78, quoting *The Illum. Co. v. Cuyahoga Cty. Court of Common Pleas*, 2002-Ohio-5312, ¶ 24.

**{¶59}** In its first assignment of error, Siltstone challenges the trial court's conclusions with respect to every element of Durr Farms' fraudulent inducement claim. Because we find Durr Farms cannot establish its reliance on Siltstone's alleged misrepresentations/omissions was legally justifiable, we limit our analysis to the fourth element of Durr Farms' fraud in the inducement claim.

**{¶60}** In Ohio, the recording of a document with the recorder is "constructive notice to the whole world of the existence and contents of [the] document as a public record and of any transaction referred to in that public record, including, but not limited to, any transfer, conveyance, or assignment reflected in that record." R.C. 1301.401(B). Thus, the public "is considered to have discovered that public record and any transaction referred to in the record as of the time that the record was first . . . tendered to a county recorder for recording." R.C. 1301.401(C).

**{¶61}** " 'Constructive notice' is notice 'arising by presumption of law from the existence of facts and circumstances that a party had a duty to take notice of.' " *Swader v. Paramount Prop. Mgmt.*, 2012-Ohio-1477, ¶ 24 (12th Dist.) quoting *Black's Law Dictionary*, (8th Ed.2004). " 'Constructive notice,' refers to that which the law regards as sufficient to give notice and is regarded as a substitute for actual notice or knowledge." *Id.* (internal citations omitted).

**{¶62}** In *Traverse v. Long*, 165 Ohio St. 249 (1956), the Ohio Supreme Court observed:

> The principle of caveat emptor applies to sales of real estate relative to conditions open to observation. Where those conditions are discoverable and the purchaser has the opportunity for investigation and determination without concealment or hindrance by the vendor, the purchaser has no just cause for complaint even though there are misstatements and misrepresentations by the vendor not so reprehensible in nature as to constitute fraud. *See* 55 American Jurisprudence, 553, Section 79, and 91 C.J.S., Vendor & Purchaser, § 51, p. 908.

*Id.* at 252. In an opinion reaffirming caveat emptor's applicability in Ohio over thirty years later, the Ohio Supreme Court observed nearly every sale would invite litigation instituted by a disappointed buyer absent the doctrine. *Layman v. Binns*, 35 Ohio St.3d 176, 177 (1988). "A seller of realty is not obligated to reveal all that he or she knows. A duty falls upon the purchaser to make inquiry and examination." *Id.*

**{¶63}** The rule of law first announced in *Traverse* has been extended in Ohio to include public records, imposing a duty on prospective purchasers to conduct a title search. For instance, in *Savage v. Residenz Realty*, 1997 WL 624334 (2d Dist. Oct. 10, 1997), the Savages asserted Residenz committed fraud by failing to inform the Savages that a signature was required for the contract to be binding and the contract was not, in fact, signed. However, the Second District opined:

> Even if the Savages relied to their detriment upon Residenz's silence on these matters, such reliance is not legally justifiable and is, therefore, insufficient to support a claim for fraud. Rights of ownership in real property are matters of public record and are therefore easily discoverable. *Noth v. Wynn* (1988), 59 Ohio App.3d 65, 67, 571 N.E.2d 446. Where conditions are discoverable and a purchaser has opportunity for investigation, he has no just cause for complaint. *Traverse v. Long* (1956), 165 Ohio St. 249, 252, 135 N.E.2d 256. For this reason, numerous cases in Ohio have held that

even affirmative misrepresentations regarding property ownership cannot support an action for fraud. *See, e.g.*, *Van Horn v. Peoples Banking Co.* (1990), 64 Ohio App.3d 745, 748, 582 N.E.2d 1099; *Noth*, supra, at 67, 571 N.E.2d 446; *Finomore v. Epstein* (1984), 18 Ohio App.3d 88, 90, 481 N.E.2d 1193. It is a comparatively easier case where an alleged silence is involved because the justification for reliance is weaker. These cases have held that the purchaser in a real estate transaction has a duty to inquire into the title. *See Finomore, supra.* The Savages were bound by a like duty, and having failed to take that precaution, they cannot then seek any resulting damages from Residenz.

*Id.* at *6.

{¶64} We applied the rule in *Davis v. Montenery*, 2007-Ohio-6221 (7th Dist.). In that case, Davis purchased real property from Montenery. Prior to the sale, Davis asked Julian, the realtor representing Montenery, about access to a barn located on Montenery's property. Montenery informed the realtor that she accessed the barn by way of an easement on a neighboring property. Julian did not ask Montenery whether the easement was transferrable.

{¶65} Julian located the original easement, which granted use of the neighboring roadway to Montenerey and her heirs and assigns. However, Julian failed to discover an amended easement, in which the Montenerys released the easement as to their heirs and assigns. As a consequence, Julian incorrectly informed Davis that the original easement ran with the land, and provided to Davis a copy of the deed containing the original easement.

{¶66} In the meantime, Thomas, an attorney, performed title work on behalf of the bank financing Davis' loan. Thomas was aware the easement expired upon conveyance of the land, but the bank did not inform Davis.

{¶67} Davis used the roadway to access the barn for three years, then he received a letter informing him he had no legal right to use the roadway. Thomas attempted to renegotiate the easement on Davis' behalf to no avail.

**{¶68}** Relevant to the above-captioned case, Davis filed an action against Montenery for breach of contract, fraud, and negligence, and against Julian's real estate company for negligence. While Montenery never spoke directly to Davis, we recognized Julian acted as Montenery's agent, so Montenery was liable for Julian's misrepresentations. With respect to Davis' fraud claim, we wrote:

Given th[e]se facts, [Montenery's] actions cannot amount to fraud. Fraud consists of "(a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance." *Groob v. KeyBank*, 108 Ohio St.3d 348, 2006-Ohio-1189, 843 N.E.2d 1170, ¶ 47, quoting *Gaines v. Preterm-Cleveland Inc.* (1987), 33 Ohio St.3d 54, 55, 514 N.E.2d 709. There is no evidence to indicate that Montenery ever made any representation that the easement would survive the conveyance.

Furthermore, any possible oral concealment of the validity of the easement by Montenery did not amount to fraud. *Patton v. Ditmyer*, 4th Dist. Nos. 05CA12, 05CA21, and 05CA22, 2006-Ohio-7107, 2006 WL 3896780, ¶ 41-42 ("When any adversities regarding title to property are of public record and therefore easily discoverable, the purchaser of the property is not entitled to rely upon the seller's alleged misrepresentations"). Courts have routinely dismissed, as a matter of law, fraud and misrepresentation claims related to land size or lot boundaries when the true size or boundaries are readily discoverable or otherwise made known to the purchasers during the transaction. *Id.*, citing *Parahoo v. Mancini* (Apr. 14, 1998), 10th Dist. No. 97APE08–1071, 1998 WL 180539 (explaining caveat-emptor-barred claims when the title was public record and therefore easily discoverable and the seller did not engage in affirmative misrepresentation

or concealment so reprehensible in nature as to constitute fraud), *Van Horn v. Peoples Banking Co.* (1990), 64 Ohio App.3d 745, 747, 582 N.E.2d 1099; *Finomore v. Epstein* (1984), 18 Ohio App.3d 88, 91, 18 OBR 403, 481 N.E.2d 1193 [transfer by quit claim deed puts buyer on notice of potential defects in title]; and *Ralston v. Grinder* (1966), 8 Ohio App.2d 208, 37 O.O.2d 213, 221 N.E.2d 602. Thus, there was no evidence that Montenery's oral statement amounted to fraud.

Similarly, Julian's actions as the agent for Montenery would also not amount to fraud causing Montenery to be liable for fraud. As stated above, Julian admits that Montenery never indicated to her that the easement would survive conveyance. Julian, however, did do a search at the courthouse to determine whether Montenery was correct about having an easement. Julian's search at the courthouse revealed that Montenery did have an easement. Julian showed that deed containing the easement to Davis. However, Julian's search was not complete. She did not find the second deed that extinguished the ability to assign the easement. Her actions at most amounted to negligence for negligent misrepresentation.

*Davis* at ¶ 53-55.

**{¶69}** Turning to the negligent misrepresentation claim against Julian, Davis was asked at his deposition if he relied on Julian's representation regarding the easement. Despite the fact that Thomas was employed by the bank that provided Davis' financing, Davis responded, "No. I went to [Thomas] on that." *Id.* at ¶ 72. As Davis clearly admitted he undertook his own investigation regarding the easement and did not justifiably rely on Julian's misrepresentation, we affirmed the trial court's decision entering summary judgment in favor of Julian on Davis' negligence misrepresentation claim.

**{¶70}** In entering summary judgment in favor of Durr Farms, the trial court was "unpersuaded" by the rule of law applied in *Montenery*, because "Durr did everything a reasonably prudent buyer could be expected to do." However, the same is true of Davis in *Montenery*. Nevertheless, the trial court opined:

Case No. 24 BE 0050

Showcase Title's acts united with Siltstone's bad acts and jointly caused Durr Farm's injury. "However, it is generally true that, where an original act is wrongful and in a natural and continuous sequence produces a result which would not have taken place without the act, proximate cause is established, and the fact that some other act unites with the original act to cause injury does not relieve the initial offender from liability." *Strother v. Huchinson* (1981), 67 Ohio St.2d 282, 287, 423 N.E.2d 467, quoting *Foss-Schneider Brewing Co. v. Ulland* (1918), 97 Ohio St. 210, 119 N.E. 454.

(10/16/24 Summary Judgment J.E., p. 15-16.)

**{¶71}** The trial court concluded Siltstone committed "bad acts." However, Durr Farms failed to demonstrate an element of fraud, that is, justifiable reliance on Siltstone's alleged misrepresentations/omission, because the Easement was a matter of public record.

**{¶72}** In property transactions, there is no right to rely upon oral representations regarding the property transferred where the true facts are equally open to both parties. *Traverse*, *supra,* 165 Ohio St. at 252. For instance, the Fourth District applied the doctrine of caveat emptor to a claim for breach of a general warranty deed in *Patton v. Ditmyer*, 2006-Ohio-7107 (4th Dist.). The Fourth District opined:

In the deed and the purchase agreement, the Arnolds represented that they owned Lot 707. This turned out to be false. Because the Pattons readily could have discovered that Ditmyer's house sat on Lot 707 by reviewing the land survey and ensuring that they reviewed it before closing on the property, they had no right to rely upon the Arnolds' representation that they conveyed Lot 707. Because the Pattons could have readily discovered the actual boundaries of the property they were purchasing and that Ditmyer's house sat on Lot 707, caveat emptor bars their claims.

*Id.* at ¶ 43.

Case No. 24 BE 0050

**{¶73}** Ohio courts have dismissed fraud claims based on the purchaser's failure to justifiably rely on a seller's alleged misrepresentation/omission where the encumbrance at issue is a matter of public record. Although the same courts have acknowledged the "so reprehensible in nature as to constitute fraud" exception to the rule of caveat emptor in cases involving public records, no Ohio court has applied the exception. The standard must be something greater than typical common-law fraud, as Ohio courts have dismissed garden-variety fraud claims that alleged misrepresentation/omission is belied by the public records, a fraud claim cannot stand.

**{¶74}** We further find Durr Farms did not justifiably rely on Attorney Faust's representations because Durr Farms engaged Showcase Title to perform a title search. Like the attorney in *Montenery, supra*, Showcase Title failed to inform Durr Farms about the existence of the Easement. Nevertheless, Durr Farms' independent investigation of the title forecloses its argument that it justifiably relied on Siltstone's alleged misrepresentations/omissions.

**{¶75}** Durr Farms concedes in its appellate brief that it tendered payment for the Property "in reliance upon *both Siltstone's misrepresentations and Showcase [Title's] title report.* (Emphasis in original) (Appellees' Brf., p. 18.) However, Durr conceded it was the responsibility of the "title people" to conduct the title search and report the results. (Durr Dep., p. 210.) Durr mistakenly believes Siltstone "hid information and because [of this] the title company did not find it." (*Id.* at p. 211.)

**{¶76}** The trial court relied on the theory that an intervening tortfeasor does not supplant the liability of the original tortfeasor. However, Durr Farms cannot establish Siltstone committed fraud in the inducement because Durr Farms cannot demonstrate fraud where the alleged misrepresentation/omission is a matter of public record, and Durr Farms engaged Showcase Title to perform a title search.

**{¶77}** At oral argument, Durr Farms argued the legal standards for fraudulent inducement and fraudulent concealment are distinguishable. Durr Farms argued it was fraudulently induced by Siltstone's alleged misrepresentations/omissions into executing the PSA prior to the involvement of Showcase Title. However, the PSA was plainly made contingent upon a title search to be performed by Durr Farms.

**{¶78}** Durr Farms further argued Siltstone had a duty to disclose the Easement similar to a homeowner's duty to disclose a wet basement. However, Siltstone fulfilled its duty to disclose when it recorded the Easement in the county recorder's office. To hold otherwise would shift liability to Siltstone for Showcase Title's failure to disclose the Easement to Durr Farms.

**{¶79}** Accordingly, we find Siltstone's first assignment of error has merit because the Easement was a matter of public record and Durr Farms engaged Showcase Title to perform a title search. Because Durr Farms cannot establish that it justifiably relied on Siltstone's alleged misrepresentations/omissions, we reverse the trial court's entry of summary judgment in favor of Durr Farms on its fraud in the inducement claim and enter summary judgment in favor of Siltstone.

## ASSIGNMENT OF ERROR NO. 3

**THE TRIAL COURT ERRED IN HOLDING THAT DURR [FARMS] PROVED A BREACH OF THE DEED.**

**{¶80}** A general warranty deed warrants that the property is free from all encumbrances. R.C. 5302.05. In contrast, a limited warranty deed warrants that the property is free only "from all encumbrances made by the grantor." R.C. 5302.07. Insofar as Siltstone granted the Easement to Siltstone Services, Durr Farms contends Siltstone is liable for breach of the limited warranty deed. Ohio law provides, under a warranty deed, the grantee will only be barred from asserting a breach of the warranty if an encumbrance was specifically excepted in the deed. *Long v. Moler*, 5 Ohio St. 271, 274 (1855).

**{¶81}** The Deed is captioned "Limited Warranty Surface Deed" and contains the language – "with limited warranty" – which is required in Ohio to constitute a limited warranty deed. However, the Deed excepts from its warranty all easements in the public records. In other words, the form of the Deed warrants against encumbrances placed on the Property by the seller (the Easement), but the provisions contained therein exclude easements that are of public record.

**{¶82}** In the case of contracts, deeds, or other written instruments, the construction of the writing is a matter of law reviewed de novo. *Long Beach Assn., Inc. v. Jones*, 82 Ohio St.3d 574, 576 (1998). If the terms of the writing are clear and unambiguous, the court is compelled to give the words their plain and ordinary meaning and may not create a new contract by finding the parties intended something not set out in the contract. *Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St.2d 241, 246 (1978).

**{¶83}** Siltstone argues the Deed plainly excludes all easements of record. The trial court held the exclusion was "general" not "specific," and therefore did not exclude the Easement.

**{¶84}** There is no Ohio case law addressing the specificity required to exclude an encumbrance from a warranty deed. In *Moler, supra,* 5 Ohio St. at 274*,* the encumbrance at issue was property taxes. The Ohio Supreme Court reversed judgment in favor of the seller based on the plain language of the general warranty deed:

> 'That at the time of the ensealing and execution of said deed, the said lands are free and clear of all incumbrances whatsoever.' The covenant itself, in express terms, relates to the time of the execution of the deed containing it. The covenant embraces in terms, 'all incumbrances whatsoever,' and excepts none whatsoever. It was in the power of the parties, at the time of the execution of the deed, to have ingrafted on the covenant an exception of the taxes of the current year, if such had been their agreement, and the statute above quoted afforded them all the information requisite to enable them to act intelligently. The parties may have had an understanding resting in parol, to the effect that the taxes of the current year were to be excepted from the operation of this covenant. But this we can not know; for parol evidence is inadmissible to contradict or vary the plain provisions of the deed. The application of the rule may possibly, in this case, work injustice to the [seller]. If so, we can only regret it; for the rule itself, being a salutary one, must be maintained.

*Moler*, at 274.

Case No. 24 BE 0050

{¶85}  The same is true here. The Deed excepts easements of record. The trial court predicated its conclusion that the exception was general not specific because it included all easements of record, not simply easements recorded in the chain of title of the Property.  However, the Easement in this case can be and was found in the title searches of the Property.  As the plain language of the Deed excepts recorded easements and the Easement was of public record, we find the trial court erred in entering summary judgment on Durr Farms' breach of warranty deed claim.

{¶86}  Next, Durr Farms contends the Deed grants surface damage payments to Durr Farms in contravention of the Easement. The Deed reads in relevant part:

All surface damage payments and the right to receive free gas (or payment in lieu thereof) pursuant to any existing or future contract for mineral development shall be payable to the surface owner at the time of surface disruption.

{¶87}  The Easement reads, in relevant part:

Grantee shall pay to Grantor an amount equal to the tax appraised value of the portion of the surface property that is permanently displaced (on a per square foot basis) by each well pad and/or pipeline installed on the Property pursuant to this Agreement; and, said amount shall be paid by Grantee and received by Grantor as full and complete compensation for all damages to the Property.

{¶88}  Durr Farms contends Siltstone could not grant the right to surface damage payments in the deed because Siltstone Services must pay Siltstone for surface damage payments in the Easement. To the contrary, the foregoing provisions are not irreconcilable.  Siltstone Services is contractually obligated to pay Siltstone under the Easement, while Siltstone is obligated to pay Durr Farms according to the Deed.

{¶89}  Finally, Durr Farms argues summary judgment in favor of Siltstone would create an absurd result, because Siltstone agreed in the PSA to provide a limited warranty deed to Durr Farms. However, the same exception for recorded easements that appears in the Deed likewise appears in the PSA.

Case No. 24 BE 0050

**{¶90}** Because the clear and unambiguous language in the Deed excepts recorded easements, we find Siltstone's third assignment of error has merit. Accordingly, we reverse the entry of summary judgment in favor of Durr Farms on its breach of warranty deed claim and enter judgment in favor of Siltstone.

## ASSIGNMENT OF ERROR NO. 2

## THE TRIAL COURT ERRED IN QUASHING THE SUBPOENA ISSUED TO [ATTORNEY JOHNSON].

## ASSIGNMENT OF ERROR NO. 4

## THE TRIAL COURT ERRED IN ITS CALCULATION AND AWARD OF DAMAGES.

**{¶91}** Insofar as we reverse the entry of summary judgment in favor of Durr Farms and enter judgment in favor of Siltstone on both claims, we reverse the judgment entry awarding compensatory and punitive damages, and attorney fees and costs to Durr Farms. Therefore, Appellant's second and fourth assignments of error are moot.

## CONCLUSION

**{¶92}** Because the Easement was a matter of public record, we reverse the entry of summary judgment in favor of Durr Farms on its fraud in the inducement claim and enter judgment in favor of Siltstone. Because the Deed specifically excepts easements of record from the limited warranty, we reverse the entry of summary judgment in favor of Durr Farms on its breach of warranty deed claim and enter judgment in favor of Siltstone. Finally, we reverse the judgment entry awarding compensatory and punitive damages, and attorney fees and costs to Durr Farms.

Waite, J., concurs.

Robb, P.J., concurs.

Case No. 24 BE 0050

_____

For the reasons stated in the Opinion rendered herein, Siltstone's first and third assignments of error are sustained and the second and fourth assignments of error are moot. It is the final judgment and order of this Court that we reverse the judgment of the Court of Common Pleas of Belmont County, Ohio, entering summary judgment in favor of Durr Farms on its fraud in the inducement claim and breach of warranty deed claim, and we enter judgment in favor of Siltstone on both claims. The judgment entry awarding compensatory and punitive damages, and attorney fees and costs to Durr Farms is reversed. Costs to be taxed against the Appellee.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**